UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| American Alliance for Equal Rights,<br><br>Plaintiff,<br><br>v.<br><br>The Women, LLC and<br>The Women Foundation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:25-cv-00441-KAC-DCP<br><br>District Judge Katherine A. Crytzer<br>Magistrate Judge Debra C. Poplin |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Introduction ........ 1

Summary Judgment Standard ........ 2

Statement of Undisputed Material Facts ........ 3

Argument ........ 6

I. This Court lacks subject-matter jurisdiction to consider Plaintiff's claims. ........ 6

A. Plaintiff did not have standing to challenge the 2025 program. ........ 7

B. Even if Plaintiff had standing to challenge the 2025 program, Plaintiff's claims are moot because the program did not, is not, and will not open. ........ 8

C. To the extent that Plaintiff's complaint challenges a future microloan program, those claims are not ripe ........ 10

II. Even if subject-matter jurisdiction existed, Defendants are entitled to summary judgment on both claims. ........ 12

A. Plaintiff's ECOA claim Fails because ECOA does not apply to the program ........ 12

1. Defendants are not "creditor[s]" under ECOA. ........ 12

2. Owner A is not an "applicant" under ECOA. ........ 13

B. Plaintiff's § 1981 claim fails, as no existing or future contract was impeded. ........ 15

C. Plaintiff's § 1981 claim also fails because mere deterrence is insufficient ........ 15

III. The Foundation is entitled to summary judgment on Plaintiff's ECOA and § 1981 claims because the program would qualify as a "special purpose credit program." ........ 16

A. Because the program would qualify as a special purpose credit program, a refusal to grant Owner A credit would not violate ECOA. ........ 16

B. Because the program would qualify as a special purpose credit program, a refusal to grant Owner A credit would not violate § 1981. ........ 18

C. Even assuming ECOA or § 1981 applies, the program is protected by the First Amendment and would not violate those statutes. ........ 20

1. The First Amendment bars Plaintiff's claims. ........ 20

2. Even assuming Plaintiff's claim could survive, Defendant's program is a valid affirmative action program. ........ 23

IV. The Women, LLC is entitled to summary judgment on all claims because it has no involvement in the Foundation's program ........ 23

Conclusion ........ 24

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................22

*Alexander v. AmeriPro Funding, Inc.*,
848 F.3d 698 (5th Cir. 2017) ....................13, 14

*Alston v. Spiegel*,
988 F.3d 564 (1st Cir. 2021)....................15

*Ambrose v. Welch*,
729 F.2d 1084 (6th Cir. 1984) ....................6

*Arguello v. Conoco, Inc.*,
330 F.3d 355 (5th Cir. 2003) ....................15

*Associated Gen. Contractors of Am., Cent. Ohio Div. v. City of Columbus*,
147 F. Supp. 2d 864 (S.D. Ohio 2001) ....................11

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................21

*Burt v. Playtika, Ltd.*,
132 F.4th 398 (6th Cir. 2025) ....................6

*City Commc'ns, Inc. v. City of Detroit*,
888 F.2d 1081 (6th Cir. 1989) ....................10

*Claybrooks v. Am. Broad. Cos.*,
898 F. Supp. 2d 986 (M.D. Tenn. 2012)....................22

*Consumer Fin. Prot. Bureau v. Townstone Financial, Inc.*,
107 F.4th 768 (7th Cir. 2024) ....................12, 14

*Coral Ridge Miniestries Media, Inc. v. Amazon.com, Inc.*,
142 S. Ct. 2453 (2022)....................20

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
6 F.4th 1247, 1254 (11th Cir. 2021) ....................20

*Correll v. Amazon.com, Inc.*,
No. 3:21-CV-01833-BTM-MDD, 2023 WL 6131080, at *4 (S.D. Cal. Sept. 19, 2023) ....................7, 15

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 6

*Dealer Computer Servs., Inc. v. Dub Herring Ford*,
547 F.3d 558 (6th Cir. 2008) .......... 10

*Doe v. Univ. of Mich.*,
78 F.4th 929 (6th Cir. 2023) .......... 7

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) .......... 19

*Est. of Frerichs by Dunn v. Knox Cnty.*,
No. 3:16-CV-693-TAV-CCS, 2017 WL 3160568 (E.D. Tenn. July 25, 2017) .......... 11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 9

*Genesis Healthcare Corp. v. Symczyk*,
569 U.S. 66 (2013) .......... 6

*Green v. Dillard's, Inc.*,
483 F.3d 533 (8th Cir. 2007) .......... 15

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*,
493 U.S. 365 (1990) .......... 19

*Herschfus v. City of Oak Park*,
150 F.4th 489 (6th Cir. 2025) .......... 6

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 22

*Johnson v. Transp. Agency*,
480 U.S. 616 (1987) .......... 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 7

*Miller v. Legacy Bank*,
No. 24-6105, 2024 WL 5154002 (10th Cir. Dec. 18, 2024) .......... 13

*Rabbani v. General Motors Corp.*,
No. 3:98cv425/RV, 2000 WL 36752977, at *1 (N.D. Fla. July 26, 2000) .......... 23



Case 3:25-cv-00441-KAC-DCP Document 38 Filed 10/28/25 Page 4 of 32 PageID #: 403

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................19

*Rainbow Push Coal. v. AmSouth Bank*,
No. 3:03-1059, 2005 WL 637834 (M.D. Tenn. Mar. 15, 2005)....................14

*Riethman v. Berry*,
113 F. Supp. 2d 765, 769 (E.D. Penn. 2000)....................12

*Riethman v. Berry*,
287 F.3d 274, 279 (3d Cir. 2002)....................12

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)....................21

*Roberts v. Progressive Preferred Ins. Co.*,
No. 1:23 CV 1597, 2024 WL 2295482, at *7 (N.D. Ohio May 21, 2024)....................9

*Rockwood Auto Parts, Inc. v. Monroe Cnty.*,
_ F.4th _, No. 24-1828, 2025 WL 2612020 (6th Cir. Sept. 10, 2025)....................2, 3

*Ruhrgas AG v. Marathon Oil Co.*,
526 U.S. 574 (1999)....................6

*Runyon v. McCrary*,
427 U.S. 160 (1976)....................15

*Speet v. Schuette*,
726 F.3d 867 (6th Cir. 2013)....................20

*Speet v. Schuette*,
889 F. Supp. 2d 969, 975 (W.D. Mich. 2012)....................20

*Thomas v. Pierce, Hamilton, & Stern, Inc.*,
967 F. Supp. 507 (N.D. Ga. 1997)....................13

*Tire Discounters, Inc. v. People's Dev. Co.*,
No. 3:19-CV-00483-DCLC, 2021 WL 2745871 (E.D. Tenn. July 1, 2021)....................11

*Tri-Cities Holdings LLC v. City of Johnson City*,
No. 2:13-CV-108, 2013 WL 2635337 (E.D. Tenn. June 12, 2013)....................11

*United States v. Am. Future Sys., Inc.*,
743 F.2d 169 (3d Cir. 1984)....................17, 19

*Veterans Contracting Grp., Inc. v. United States*,
133 Fed. Cl. 613, 624 n.11 (2017)....................9

*Veterans Contracting Grp., Inc. v. United States*,
920 F.3d 801 (Fed. Cir. 2019)....................9

*Vill. of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980)....................21

*W6 Rest. Grp., Ltd v. Loeffler*,
140 F.4th 344 (6th Cir. 2025)....................8, 9

*Warshak v. United States*,
532 F.3d 521 (6th Cir. 2008)....................10

**Statutes**

15 U.S.C. § 1602(g)....................12, 13

15 U.S.C. § 1691.................... *passim*

26 U.S.C. §§ 4942, 4944(c)....................21

42 U.S.C. § 1981.................... *passim*

Consumer Credit Protection Act, 15 U.S.C. § 41....................12, 13

**Other Authorities**

12 C.F.R. § 1002....................2, 14, 16, 20

12 C.F.R. § 1026.2(a)(17)(v)....................12

26 C.F.R. § 53.4945-4(a)(2)....................21

121 Cong. Rec. H16,237 (June 3, 1975)
https://www.govinfo.gov/app/details/GPO-CRECB-1975pt13/....................17

121 Cong. Rec. H27,138 (1975)....................17

86 Fed. Reg. 3762 (Jan. 15, 2021)....................16

CFPB Newsroom, CFPB Seeks to Vacate Abusive, Unjust Case Against Townstone (Mar. 26, 2025), https://www.consumerfinance.gov/about-us/newsroom/cfpb-seeks-to-vacate-abusive-unjust-case-against-townstone/....................14

Fed. R. Civ. P. 56(a)....................2

https://www.irs.gov/charities-non-profits/private-foundations/program-related-investments (last updated Oct. 9, 2025)....................21



Case 3:25-cv-00441-KAC-DCP Document 38 Filed 10/28/25 Page 6 of 32 PageID #: 405

Regularly, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/regularly (last visited Oct. 28, 2025) ....................12

Relman Colfax PLLC & National Fair Housing Alliance, Special Purpose Credit Programs at p.12-15 (Nov. 2020), https://nationalfairhousing.org/wp-content/uploads/2020/11/NFHA_Relman_SPCP_Article.pdf....................17

S. Rep. 94-589....................13

Treas. Reg. § 53.4944-3(b), Example 9 (1972) ....................21

U.S. Const. amend. I ....................20

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Defendants The Women, LLC **("the LLC")** and The Women Foundation **("the Foundation") (collectively, "Defendants")** move for summary judgment in their favor on Counts I and II of Plaintiff's Complaint [Doc. 1].

## INTRODUCTION

Defendants move for summary judgment because there is no genuine issue of material fact that the program at issue in this case never opened, as stipulated by the parties. Without any program, Plaintiff's Complaint suffers fatal jurisdictional obstacles and various pleading deficiencies that warrant summary judgment. To start, subject-matter jurisdiction does not exist. Because the 2025 program never opened, Plaintiff did not suffer an injury in fact and therefore cannot establish standing. Even if standing existed, which it does not, Plaintiff's claims are moot because the 2025 program never opened. To the extent Plaintiff's complaint challenges a future program, those claims are not ripe because they are contingent on future speculative events. No decision has been made about whether a program will open in 2026 at all and, if a program supporting local business does open, whether it would offer grants or loans, or what criteria the Foundation will use to determine award recipients.

Even if subject-matter jurisdiction existed, which it does not, Plaintiff's claims would fail. The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 does not apply because the Foundation is not a "creditor" that "regularly" extends credit as defined by the statute—averaging fewer than two awards a year over the last six years does not approach the necessary volume to qualify. Nor is Owner A an "applicant," which is required for a private party to file suit under ECOA, because Owner A never applied for credit. Plaintiff's 42 U.S.C. § 1981 claim also fails because no existing or future contract was impeded, and allegations of mere deterrence

are insufficient to invoke § 1981 liability.

Even if these statutes did apply, which they do not, the program would have been permissible as a "special purpose credit program"—a statutory provision authorizing credit assistance programs in which participants "may be required to share one or more common characteristics" such as "race." 12 C.F.R.§ 1002.8(b)(2). Plaintiff's claims would also be barred by the First Amendment because the program is part and parcel of the Foundation's expressive conduct. The program, moreover, would qualify as a valid affirmative action program, permissible under § 1981. Finally, the LLC is entitled to summary judgment on all claims because it was not involved in the program, has not issued any credit, and has not been a party to any contract at issue in this case.

**SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may demonstrate this "by pointing out the lack of evidence to support an 'essential element of the non-moving party's case.'" *Rockwood Auto Parts, Inc. v. Monroe Cnty.*, _ F.4th _, No. 24-1828, 2025 WL 2612020, at *4 (6th Cir. Sept. 10, 2025) (brackets omitted) (quoting *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017)). "The burden then shifts to the non-moving party to produce 'significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts.'" *Id.* (quoting *Miller*, 866 F.3d at 389). "Because fact-finding is the province of the jury, the judge must view the factual record in the light most favorable to the non-moving party." *Id.* (citing *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 772 (6th Cir. 2025)). "The district judge should not make credibility determinations or weigh the evidence for herself: 'the evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor.'" *Id.* (brackets omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "If the evidence is sufficient to permit a jury to 'reasonably find for either the plaintiff or the defendant,' the case must be sent to trial." *Id.* (quoting *Anderson*, 477 U.S. at 255). "But if the moving party can 'show that there is no genuine dispute as to any material fact,' then 'the movant is entitled to judgment as a matter of law.'" *Id.* (brackets omitted) (quoting Fed. R. Civ. P. 56(a)).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The Foundation is a 501(c)(3) charitable organization that was created to provide "avenues to financing for small business expansions and start-ups through crowdsourcing, community funding, and real estate investment clubs." According to the Foundation's bylaws, its purpose "is to provide access to capital to businesses in under-resourced communities in Knoxville, TN" and it "is organized exclusively for charitable purposes as defined by the Internal Revenue Service." *See* Decl. of Tanika Harper in support of Mot. for Summ. J., dated Oct. 28, 2025 at ¶¶ 5, 13 ("T. Harper Decl.").

2. The Foundation's founders focused on businesses both because of their personal experiences as small business owners and entrepreneurs and because of the critically important role that small businesses play in generating household income and wealth and providing revitalizing services to local communities. The Foundation understood entrepreneurship as a path to lift individuals, households, and communities out of poverty and established the Foundation to help address these issues. *Id*. at ¶ 12.

3. The Foundation monitors "information on income, wealth, discrimination, and business opportunities" in the U.S. and Knoxville, "to understand the ongoing economic disadvantages faced by Black households and Black-owned businesses, as well as the important

role small businesses play in counteracting those economic disadvantages." *Id*. at ¶ 14.

4. Knoxville's Black population experiences a poverty rate of 42% to 43%, three times the national average and the highest poverty rate among Southeast cities such as Memphis, Chattanooga, and Atlanta. *Id*. at ¶¶ 6, 7.

5. Further, Black-owned businesses continue to experience racial discrimination and discouragement when seeking small business financing. *Id*. at ¶¶ 21–26.

6. Historic actions adverse to Black communities in Knoxville also contribute to current economic disadvantage. The City of Knoxville passed a resolution in 2020 recognizing the impact that urban renewal continues to have on Black communities and businesses. The resolution called for the city to establish a taskforce to identify solutions to address disparities and disenfranchisement in the Black community and create generational wealth. *Id*. at ¶¶ 27–28.

7. In 2020, the Foundation launched a microloan program to create sustainable funding opportunities for the economically disadvantaged class of Black-owned businesses located in Knoxville, TN. Throughout its existence, the program has provided interest-free awards ranging from $200 to $2000 to recipients. *See* Decl. of Deidra Harper in support of Mot. for Summ. J., dated Oct. 28, 2025 at ¶¶ 4–5 ("D. Harper Decl.").

8. The program application also asked for information to ensure that businesses would have a positive impact on Black Knoxvillians living in poverty. Specifically, applicants were asked whether they operate their businesses in four zip codes with the highest poverty rate for Black Knoxvillians and whether their businesses have a positive economic impact on those communities. *Id.* at ¶ 7.

9. While the program application included questions seeking the information above, the application itself allowed an applicant the ability to proceed through the entire application

and complete it regardless of how the applicant answered the questions. The Foundation did not prevent anyone from completing the microloan application based on their answers. *Id.* at ¶ 10.

10. In the program's history, there have only been ten awards. *Id.* at ¶ 11. In some years, due to funding constraints, the Foundation has not awarded microloans to applicants that otherwise would qualify. *Id*. at ¶ 16.

11. The Foundation has never taken any legal action against award winners that have not repaid or who are not current on the awards they received. In fact, of the 10 historical awardees, only three have repaid the award in full, three have not repaid the award at all, three are late on their payments, and one is current. The funds that are repaid are reinvested in the Foundation's work to address the high poverty rate for Black Knoxvillians. *Id.* at ¶¶ 14–15.

12. The Foundation has implemented the program each year only after it has assessed various criteria. Key to that assessment is the availability of funds. The Foundation's decision to continue offering the program is affected by other considerations as well, including the business and regulatory environment, and the economic state of Black households and Black-owned businesses in Knoxville. These and other criteria inform determinations about the parameters, scope, and eligibility criteria of the program, and even whether the program will open at all. *Id.* at ¶ 18.

13. The program did not open this year and will not open again until September 2026, at the earliest. The Foundation may open the program in 2026, but will not be able to make that decision until it has more information about the availability of funds, the business and regulatory environment, and the economic state of Black households and Black-owned businesses in Knoxville, all of which will inform determinations about the parameters, scope, and eligibility criteria of the program, and even its very existence. *Id.* at ¶¶ 17–19.

14. As part of the Foundation's consideration about whether and how to open the program in 2026, it will consider whether to explicitly style the awards as non-contractual grants or whether to design it as a special purpose credit program under federal law, and, if so, how the group to be assisted would be defined. *Id.* at ¶¶ 20–21.

15. The Women, LLC, is a separate entity from the Foundation. The LLC, which is a named party to this litigation, has not offered or operated the loan program. The LLC has not issued and will not issue microloans or any other form of credit. Further, the LLC has not been and will not be a party to any contract at issue in this case. *Id.* at ¶¶ 22–23.

## ARGUMENT

### I. This Court lacks subject-matter jurisdiction to consider Plaintiff's claims.

"Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).[1] "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006); *accord Herschfus v. City of Oak Park*, 150 F.4th 489, 497 n.5 (6th Cir. 2025) ("[G]iving dispositive jurisdictional and nonjurisdictional holdings exceeds the Article III authority given to the federal courts."). A federal court lacks subject-matter jurisdiction over a claim if the plaintiff lacks standing or if the claim is moot or not ripe. *See, e.g.*, *Burt v. Playtika, Ltd.*, 132 F.4th 398, 403 (6th Cir. 2025) (standing); *Genesis Healthcare*

---

[1] While a challenge to a court's subject-matter jurisdiction is not normally considered in the context of a Rule 56 motion, "lack of subject-matter jurisdiction is a nonwaivable defect that may be raised at any time to justify dismissal of a pending action." *Ambrose v. Welch*, 729 F.2d 1084, 1805 (6th Cir. 1984). As such, if the Court is inclined to find that it lacks subject-matter jurisdiction, Defendants offer the jurisdictional arguments herein as a motion to dismiss under Rule 12(b)(1).

*Corp. v. Symczyk*, 569 U.S. 66, 78–79 (2013) (mootness); *Doe v. Univ. of Mich.*, 78 F.4th 929, 950 (6th Cir. 2023) (ripeness).

**A. Plaintiff did not have standing to challenge the 2025 program.**

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). That "[a]n injury in fact must be 'concrete'" and "particularized" "mean[s] that it must be real and not abstract," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)), and it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance," *id.* (citing *Lujan*, 504 U.S. at 560 n.1). "Second, there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976)).

Here, Plaintiff cannot prove an injury in fact. It is undisputed that the 2025 program did not open. As such, Plaintiff did not experience the asserted injury of racial discrimination or the lost opportunity to compete. The application never opened to anyone, and there simply was no competition—for Plaintiff or for anyone else. Therefore, Plaintiff cannot show that the program affected Plaintiff "in a personal and individual way." *Food & Drug Admin.*, 602 U.S. at 381. Plaintiff cannot prove injury in fact because no existing or future contract was impeded. Therefore, its claims, both of which turn on the existence of a contract, fail. *See Correll v. Amazon.com, Inc.*, No. 3:21-CV-01833-BTM-MDD, 2023 WL 6131080, at *4 (S.D. Cal. Sept.

19, 2023) (dismissing § 1981 claims). Because no injury exists, Plaintiff cannot establish causation and there is nothing for the court to redress.

### B. Even if Plaintiff had standing to challenge the 2025 program, Plaintiff's claims are moot because the program did not, is not, and will not open.

When "as a result of events during the pendency of the litigation[,] the court's decision would lack any practical effect, the case is moot." *W6 Rest. Grp., Ltd v. Loeffler*, 140 F.4th 344, 350 (6th Cir. 2025) (quoting *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 308 (6th Cir. 2020)). "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Id.* at 350 (quoting *Patton v. Fitzhugh*, 131 F.4th 383, 392–93 (6th Cir. 2025)).

Plaintiff's claims as to the 2025 program are moot. The alleged injury Plaintiff sought to avoid was Owner A not being able to apply to the 2025 program, *see* Doc. 1 ¶¶ 30, 32–33; Doc. 2 at 1, and it asked for a declaration, a preliminary and then permanent injunction, and nominal damages. Doc. 1 ¶ 59(A)–(D). The parties have since stipulated that the 2025 program is not open and that the Foundation would not open the microloan program until the 2026 cycle at the earliest, and Plaintiff withdrew its request for preliminary relief. Doc. 35 ¶¶ 1–2. This Court cannot provide Plaintiff relief as to the 2025 program that would "make a difference" or have "any practical effect" because there is no 2025 program to which any business could apply or for which the Foundation could pick winners. In short, there is no 2025 program that injured or could injure Plaintiff.

The Sixth Circuit has found mootness in similar circumstances. In *Pavia v. National Collegiate Athletic Association*, a college football player challenged an NCAA rule that barred him from playing in the 2025–26 and 2026–27 seasons. _ F.4th _, No. 24-6153, 2025 WL 2787816, at *1–2 (6th Cir. Oct. 1, 2025). The Sixth Circuit deemed moot the parties' dispute

over the 2025–26 season because the NCAA voluntarily decided not to enforce the rule at all for that season. *Id.* at *2–5. Clearer here, the Foundation's decision not to open the 2025 program at all moots the dispute over this year's program. *Cf. Veterans Contracting Grp., Inc. v. United States*, 133 Fed. Cl. 613, 624 n.11 (2017) (holding claim as to contract solicitation moot because government canceled solicitation), *aff'd*, 920 F.3d 801 (Fed. Cir. 2019); *W6 Rest. Grp., Ltd v. Loeffler*, 140 F.4th 344, 346–50 (6th Cir. 2025) (holding dispute over Small Business Administration's COVID-19 relief program moot because the program had ended); *Roberts v. Progressive Preferred Ins. Co.*, No. 1:23 CV 1597, 2024 WL 2295482, at *7 (N.D. Ohio May 21, 2024) (dismissing for lack of standing in 42 U.S.C. § 1981 challenge to 2023 grant for Black-owned small businesses in part because application window closed before plaintiffs sued and they did not allege that 2023 grant would be offered in reasonably foreseeable future). Although the parties' dispute over the 2026–27 season in *Pavia* remained a live controversy because there was no doubt that the NCAA would enforce the challenged rule for that season and the player had already challenged the application of the rule for that season, *Pavia*, 2025 WL 2787816, at *4, the Foundation here does not yet know whether it will even have a 2026 program or what it would look like, *see* Section I.C., *infra*, and Plaintiff's Complaint challenges only the now-nonexistent 2025 program.

The voluntary-cessation doctrine of mootness is not implicated here, but even if it were, it would not prevent mootness. Voluntary cessation moots a case if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). The Sixth Circuit suggested in *Pavia* that even if the voluntary-cessation doctrine applied, the claim might still have been

moot because the NCAA had made "legal representations" that it wouldn't revoke the waiver, which are "standard practice to accept … 'as parameters for decision,'" and "practical realities might [have] prevent[ed] the NCAA from rescinding the waiver." 2025 WL 2787816, at *4 (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974)). Here, the doctrine is not implicated because the Foundation did not merely cease the challenged aspect of the 2025 program; instead, the program never opened at all. But even if the doctrine were to be implicated, it would not prevent mootness because, like the NCAA in *Pavia*, Defendants have represented—and the parties have stipulated—that the 2025 program will not open.

### C. To the extent that Plaintiff's complaint challenges a future microloan program, those claims are not ripe.

"Ripeness is a question of timing" that "dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id.* The ripeness doctrine "is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Dealer Computer Servs., Inc. v. Dub Herring Ford*, 547 F.3d 558, 560 (6th Cir. 2008) (quoting *River City Capital, L.P. v. Bd. of Cnty. Comm'rs*, 491 F.3d 301, 309 (6th Cir. 2007)).

Courts ask two questions to determine whether a claim is ripe for judicial review: "(1) is the claim 'fit for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (brackets and ellipsis omitted) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "The Sixth Circuit has held that a claim is ripe when it is 'highly probable' that the alleged harm

or injury will take place." *Tri-Cities Holdings LLC v. City of Johnson City*, No. 2:13-CV-108, 2013 WL 2635337, at *1 (E.D. Tenn. June 12, 2013) (citing *Kardules v. City of Columbus*, 95 F.3d 1335, 1344 (6th Cir. 1996)).

First, Plaintiff requests an injunction "barring Defendants from knowing or considering race in any way in their loan program." Doc. 1 ¶ 59(c). As stipulated, that loan program is not currently open, and the Foundation will not open any loan program until September 2026 at the earliest. Doc. 35 ¶ 1. In fact, no decision has been made about whether the program will open in 2026 at all and, if a program supporting local business does open, whether it would offer grants or loans. Statement of Undisputed Facts, ¶¶ 13–14 ("SUF"). Furthermore, if it does open, the criteria the Foundation will use to determine loan or grant recipients has not yet been determined. *Id*. Plaintiff's alleged injury "is contingent on multiple events, the occurrences of which are merely speculative." *Est. of Frerichs by Dunn v. Knox Cnty.*, No. 3:16-CV-693-TAV-CCS, 2017 WL 3160568, at *6 (E.D. Tenn. July 25, 2017). Because this Court "cannot decide a case based on possibilities of what may happen," there is no "live case or controversy," and thus this case "is not ripe for review." *Associated Gen. Contractors of Am., Cent. Ohio Div. v. City of Columbus*, 147 F. Supp. 2d 864, 870–71 (S.D. Ohio 2001).

Second, Plaintiff will suffer no hardship if this Court withholds consideration at this time. If a 2026 program opens, and if Plaintiff objects to the structure of that program (whatever that structure may be), Plaintiff can refile its suit at that time. *See Tire Discounters, Inc. v. People's Dev. Co.*, No. 3:19-CV-00483-DCLC, 2021 WL 2745871, at *8 (E.D. Tenn. July 1, 2021) (request for relief can "be addressed if [Plaintiff's] claim ripens into an actual controversy …, [b]ut that time has not yet come").

## II. Even if subject-matter jurisdiction existed, Defendants are entitled to summary judgment on both claims.

### A. Plaintiff's ECOA claim Fails because ECOA does not apply to the program.

#### 1. Defendants are not "creditor[s]" under ECOA.

ECOA applies only to creditors. 15 U.S.C. § 1691(a). It defines "creditor," in relevant part, as "any person who *regularly* extends, renews, or continues credit." § 1691a(e) (emphasis added). ECOA's statutory context makes clear that the term "regularly" means frequently or routinely, consistent with dictionary definitions denoting activities that happen "usually fairly often." *See* Regularly, Cambridge Dictionary.[2] The Foundation, which only offers the program once a year and which has averaged fewer than two awards a year over the last six years, does not meet this definition. *See Riethman v. Berry*, 113 F. Supp. 2d 765, 769 (E.D. Penn. 2000) ("[T]he court concludes as a matter of law that one extension of credit over two (2) years does not constitute the 'regular' extension of credit."), *aff'd*, 287 F.3d 274, 279 (3d Cir. 2002).

ECOA's sister statute, the Truth in Lending Act ("TILA") provides further support. TILA also defines the term "creditor" to mean a person that "regularly" extends credit. 15 U.S.C. § 1602(g). And under TILA's implementing regulation, "[a] person regularly extends consumer credit only if it extended credit . . . more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year." 12 C.F.R. § 1026.2(a)(17)(v). Interpretations of TILA generally inform interpretations of ECOA because ECOA was modeled to align in significant ways with the earlier enacted TILA and the two are separate subchapters in the same chapter, the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. § 41. *See, e.g., Consumer Fin. Prot. Bureau v. Townstone Financial, Inc.*, 107 F.4th 768, 774 (7th Cir. 2024)

---

[2] Regularly, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/regularly (last visited Oct. 28, 2025).

(noting ECOA rulemaking authority was modeled after TILA authority); *Thomas v. Pierce, Hamilton, & Stern, Inc.*, 967 F. Supp. 507, 510 (N.D. Ga. 1997) (noting that ECOA is part of the CCPA, and therefore interpreting statutory language in light of usage in other parts of the CCPA); *see also* S. Rep. 94-589, at *12 (explaining that various provisions of ECOA were modeled to align with TILA).

The Foundation's activity does not come close to that volume. ECOA does not apply to activities that occur only once to twice yearly, or potentially not at all. Each year, the Foundation must assess, among other criteria, whether sufficient funds exist to make an award at all. SUF, ¶ 12. In 2025, funds did not exist, and the program was not opened. SUF, ¶ 13. Although the Foundation may open the program and provide an award in 2026, it will not be able to make that decision until it has more information which will inform determinations about the parameters, scope, and eligibility criteria of the program, and even its very existence. SUF, ¶¶ 12–14. Because these award decisions are not happening "regularly," the Foundation is not a "creditor" and ECOA does not apply.

**2. Owner A is not an "applicant" under ECOA.**

Because Owner A did not apply to the program, Plaintiff does not have a viable ECOA claim. Only "aggrieved applicant[s]" are afforded a private right of action under ECOA. 15 U.S.C. § 1691e(a)–(c). ECOA defines the term "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b). Owner A never even inquired into the program, let alone applied. Accordingly, she is not an "aggrieved applicant," and Plaintiff's claim fails. *See, e.g.*, *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 707–08 (5th Cir. 2017) (dismissing claim because plaintiffs did not apply for or otherwise request credit); *Miller v. Legacy Bank*, No. 24-6105,

2024 WL 5154002, at *3 (10th Cir. Dec. 18, 2024) (similar); *Rainbow Push Coal. v. AmSouth Bank*, No. 3:03-1059, 2005 WL 637834, at *2 (M.D. Tenn. Mar. 15, 2005) (similar).

Nor can Plaintiff bring a claim under the Regulation B provision that prohibits creditors from engaging in conduct directed "to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application" 12 C.F.R. § 1002.4(b). As the Fifth Circuit in *Alexander* explained, "[d]iscouragement of a 'prospective applicant' may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under ECOA," because the regulatory discouragement provision does not alter the fact that only an "aggrieved applicant"—not a "prospective applicant"—may bring a private cause of action. 848 F.3d at 708. That reasoning is consistent with the Seventh Circuit's decision in *Consumer Fin. Prot. Bureau v. Townstone Financial Inc.*, 107 F.4th 768, 776 (7th Cir. 2024), holding that Regulation B's prohibition against discouraging prospective applicants does not contradict ECOA's plain text, and so may be enforced by the Consumer Financial Protection Bureau ("CFPB") via its administrative enforcement authority. *Id*. at 776.[3]

---

[3] The Seventh Circuit had no occasion to address whether a private right of action existed to enforce this provision because the underlying suit was initiated by the CFPB under its independent enforcement authority, which is not limited to "aggrieved applicants." *See Alexander*, 848 F.3d at 708 n. 11 ("Administrative agencies have broader enforcement powers under ECOA than individuals attempting to bring private causes of action." (citing 15 U.S.C. §§ 1691c, 1691e)).

Moreover, the CFPB has indicated that it is pursuing changes to Regulation B. *See* Off. of Info. & Regul. Aff., Off. of Mgmt. & Budget, Equal Credit Opportunity Act, Pending EO 12866 Regulatory Review (Sept. 24, 2025), https://www.reginfo.gov/public/do/eoDetails?rrid=1119664. Although the CFPB has not announced what provisions it might amend, it is likely that the agency will revisit the prohibition against discouraging prospective applicants, particularly because the CFPB has articulated complaints with the theory of the suit that led to the Seventh Circuit's *Townstone* opinion. *See* CFPB Newsroom, CFPB Seeks to Vacate Abusive, Unjust Case Against Townstone (Mar. 26, 2025), https://www.consumerfinance.gov/about-us/newsroom/cfpb-seeks-to-vacate-abusive-unjust-case-against-townstone/. Accordingly, even if Regulation B's prohibition against

### B. Plaintiff's § 1981 claim fails, as no existing or future contract was impeded.

Plaintiff's § 1981 claim is not actionable, because no existing or future contract was impeded. *See Correll v. Amazon.com, Inc.*, No. 3:21-CV-01833-BTM-MDD, 2023 WL 6131080, at *4 (S.D. Cal. Sept. 19, 2023). A § 1981 plaintiff cannot simply be an observer of a potentially discriminatory policy; they must be an actual victim who was directly prevented from forming a specific contract. The 2025 loan program at issue in this litigation never opened. *See* Doc. 35; *see also* SUF, ¶ 13. Accordingly, Plaintiff could not have plausibly formed any contract with the Foundation.

### C. Plaintiff's § 1981 claim also fails because mere deterrence is insufficient.

Deterrence is not sufficient to sustain a § 1981 claim. *See Correll*, 2023 WL 6131080, at *4. As outlined by the court in *Correll*, "[s]everal other circuits have held that a defendant must preclude the plaintiff from entering into a contract to establish a Section 1981 claim, whereas mere deterrence is insufficient." *Correll*, 2023 WL 6131080, at *4 (collecting cases supporting this proposition, including *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358–59 (5th Cir. 2003); *Alston v. Spiegel*, 988 F.3d 564, 572 (1st Cir. 2021); and *Green v. Dillard's, Inc.*, 483 F.3d 533, 539 (8th Cir. 2007)). The *Correll* court noted that this interpretation corresponds with language used by the Supreme Court in describing § 1981 liability, including in *Runyon v. McCrary*, 427 U.S. 160, 172 (1976), where the Court "subjected defendants to liability under § 1981 when, for racially motivated reasons, they *prevented* individuals who 'sought to enter into contractual relationships' from doing so." *Correll*, 2023 WL 6131080, at *4 (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)) (emphasis in *Correll*)).

---

discouraging prospective applicants could be enforced by private parties, the regulatory prohibition may not exist if or when there is a future round of the program.

Here, the program never opened in 2025 to begin receiving applications. SUF, ¶ 13. No one applied—including the Plaintiff—and no contractual relationship could have been prevented because there was no active program for this year. *Id*. Further, the Foundation needs to make decisions about any 2026 program, including its existence but also whether it will be structured as a pure grant program with no consideration required, which would mean it is not a contract. *Id*. at ¶ 13–14.

## III. The Foundation is entitled to summary judgment on Plaintiff's ECOA and § 1981 claims because the program would qualify as a "special purpose credit program."

### A. Because the program would qualify as a special purpose credit program, a refusal to grant Owner A credit would not violate ECOA.

As explained, summary judgment should be granted dismissing Plaintiff's ECOA claims because the statute does not apply. But even if it did apply, the program would not violate ECOA or § 1981 because it would qualify as a "credit assistance program administered by a nonprofit organization for … an economically disadvantaged class of persons," 15 U.S.C. § 1691(c)(2), sometimes referred to as a "special purpose credit program" ("SPCP"). SPCP participants "may be required to share one or more common characteristics" such as "race." 12 C.F.R.§ 1002.8(b)(2). Accordingly, a refusal to grant credit is not a violation if "the applicant does not meet the eligibility requirements under a [SPCP]." 12 C.F.R. part 1002, Supp. I, .8(a)-4; *see also* CFPB Advisory Opinion, Equal Credit Opportunity (Regulation B); Special Purpose Credit Programs, 86 Fed. Reg. 3762 (Jan. 15, 2021) (clarifying SPCP criteria). In other words, although ECOA generally proscribes race discrimination in extensions of credit, the SPCP provision covering nonprofits ensures the continued legality of credit programs designed to benefit economically disadvantaged protected classes, including racial or ethnic groups. The legislative history accompanying passage of the SPCP provisions makes plain that Congress intended to ensure the legality of programs designed to "extend credit to *young* people, or to *old* people, or to

*minority* groups." *United States v. Am. Future Sys., Inc.*, 743 F.2d 169, 175 (3d Cir. 1984) (quoting House Subcommittee Chairperson, 121 Cong. Rec. H27,138 (1975).[4]

Here, the co-founders established the Foundation in 2020 as a 501(c)(3) nonprofit organization after learning about the extremely high poverty rates among Black residents of Knoxville and the challenges that Black-owned businesses, in particular, face accessing traditional financial services like banking and small business credit. SUF, ¶ 1–9. They were aware of data demonstrating that Black households are economically disadvantaged, including that on average they have significantly lower incomes, less wealth, and lower homeownership rates than white households. T. Harper Decl. at ¶¶ 6–10, 34–38. They were also aware that Black-owned businesses face discrimination in seeking capital, including credit or other financing. *Id*. at ¶¶ 10, 21–26, 29–33. They focused on businesses both because of their experiences as small business owners, and because of the important role that small businesses play in generating household income and wealth and providing revitalizing services to local communities. *Id*. at ¶¶ 12, 15–20.

The program has historically defined the economically disadvantaged class it is designed

[4] In floor debates on the SPCP amendments, the House specifically approved of "laws which provide specific benefits for loans to minority enterprises." 121 Cong. Rec. H16,237, H16,743 (June 3, 1975) (Rep. Wylie) ("The city of Columbus has been an outstanding and shining example of a community which has made credit money available to minority enterprises under arrangements which encourage the loaning [to] minority businessmen and we want to be sure that such lending practice would not be discouraged … the loan of money to minority enterprises by businessmen to a community is not unlawful per se and can, in effect, be made the basis of affirmative discrimination."), https://www.govinfo.gov/app/details/GPO-CRECB-1975pt13/. That same member explained that "we do not want to prohibit discrimination in the granting of credit to a particular ethnic group," noting favorably an existing program where lending institutions were encouraged to loan money to "a black-oriented group." *Id*. *See also* Relman Colfax PLLC & National Fair Housing Alliance, Special Purpose Credit Programs at p.12–15 (Nov. 2020) (describing legislative and regulatory history), https://nationalfairhousing.org/wp-content/uploads/2020/11/NFHA_Relman_SPCP_Article.pdf.

to benefit as Black-owned businesses located in Knoxville, TN. D. Harper Decl. at 4. As part of the application process, the program has also assessed criteria relevant to whether applicants themselves were economically disadvantaged, including household income. *Id*. at ¶¶ 7–9. Household income provided by applicants has ranged from $25,000 to $100,000. *Id*. at 12. Even the highest of those household incomes is significantly lower than the overall median household income for small business owners in the United States ($125,000). *Id*.

Accordingly, if it were covered by ECOA, the program would have been an SPCP offered by a not-for-profit organization for an "economically disadvantaged class of persons." This means that even if Owner A had applied—which they did not—a refusal to extend them credit because they were not part of the identified economically disadvantaged class of persons would not have violated ECOA. *See* 15 U.S.C. § 1691(c)(2).

As noted, although the Foundation may open a variation of the program and provide an award in 2026, it will not be able to make that decision until it has more information about, for example, the availability of funds and the business and regulatory environment at that time, all of which will inform determinations about the likelihood, scope, parameters, and eligibility criteria of the program. SUF, ¶ 12–14. It has also not determined whether a 2026 program, if launched, would be designed as an SPCP, and if so, how the group to be assisted would be defined. *Id*.

**B. Because the program would qualify as a special purpose credit program, a refusal to grant Owner A credit would not violate § 1981.**

Even assuming § 1981 would apply, which it would not, Plaintiff's § 1981 claim would fail because ECOA-compliant SPCPs do not violate § 1981. Section 1981 generally prohibits race-based discrimination in contracting, whereas ECOA and Regulation B explicitly permit race-based decisions in a specific category of contracting (the extension of credit) in certain circumstances. Although § 1981 does not have a corresponding explicit permission, an ECOA-

compliant SPCP does not violate § 1981.

It is well recognized that when two statutes regulate the same topic, they should be interpreted in a manner that harmonizes them so that they are both given effect. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) ("[T]his Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both." (*quoting Morton v. Mancari*, 417 U. S. 535, 551 (1974))). To give effect to that principle, "[i]t is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.'" *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) (*quoting Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)).

Section 1981 broadly prohibits discrimination on the basis of race in contracting. Compare that broad reach to the scope of ECOA, which prohibits discrimination on the basis of race in one type of contracting (credit), and ECOA's nonprofit SPCP provision, which addresses an even narrower set of circumstances—namely, the extension of credit to benefit members of an economically disadvantaged class of persons. Because it is "a commonplace of statutory construction that the specific governs the general," the specific SPCP provisions are best understood as clarifying conditions under which such programs are permissible under all overlapping general antidiscrimination laws. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal citation omitted). This reading gives effect to § 1981—which continues to apply to contracts not governed by ECOA's SPCP provisions—as well as the SPCP provisions themselves, which were intended to increase access to the credit market and avoid discouraging "ongoing special programs which prefer applicants in certain categories." *Am. Future Sys. Inc.*, 743 F.2d at 175 (3d Cir. 1984) (quoting S. Rep. No. 589, U.S.C.C.A.N.

403, 407).

Decades of regulations and guidance from agencies charged with interpreting and implementing ECOA and other overlapping antidiscrimination laws support this interpretation, including longstanding provisions in Regulation B creating standards for establishing SPCPs—as ECOA requires be done by regulation. *See, e.g.*, 15 U.S.C. § 1691(c) (directing the Federal Reserve Board and now the CFPB to prescribe regulations implementing SPCP standards). If such programs violated § 1981, statutorily-required standards governing SPCPs where "program participants may be required to share one or more common characteristics (for example, race …)," 12 C.F.R § 1002.8(b)(2), would be not just meaningless, but a legal bait-and-switch. Accordingly, for all the aforementioned reasons, the program would qualify as an SPCP and so would not violate those laws. As noted, determinations about future iterations of the program depend on various circumstances and will not be made for many months.

### C. Even assuming ECOA or § 1981 applies, the program is protected by the First Amendment and would not violate those statutes.

#### 1. The First Amendment bars Plaintiff's claims.

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. "The First Amendment protects expressive conduct as well as speech." *Speet v. Schuette*, 889 F. Supp. 2d 969, 975 (W.D. Mich. 2012), *aff'd*, 726 F.3d 867 (6th Cir. 2013); *see also Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) ("'Constitutional protection for freedom of speech does not end at the spoken or written word'; the First Amendment also protects expressive conduct."), *cert. denied*, 142 S. Ct. 2453 (2022). An organization engages in "expressive conduct" when it makes decisions regarding the recipients of its charity. *See Coral Ridge*, 6 F.4th at 1254.

Under well-established law, there is little doubt that donative activity is a form of

speech—both the act of donating to a charity, and the spending of those donations by a charity for a charitable purpose. *See Buckley v. Valeo*, 424 U.S. 1 (1976) (expenditure of money is protected speech); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (finding that charitable solicitations "involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment"); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (holding that any commercial component of charitable solicitation that is "inextricably intertwined" with the charitable purpose is entitled to full First Amendment protection). In fact, charitable spending is the expressive realization of association.

A charity's freedom to express its views and beliefs through charitable activities is part and parcel of its stated mission or purpose. Charitable assistance takes many forms. Private foundations, for example, can provide charitable assistance through grants to organizations or to individuals. Grants also can include loans and investments. *See* 26 C.F.R. § 53.4945-4(a)(2). Specifically, program-related investments are transactions where a foundation provides capital to a charitable beneficiary while expecting a return on the investment. *See* I.R.S., Program-Related Investments.[5] *See also* 26 U.S.C. §§ 4942, 4944(c); Treas. Reg. § 53.4944-3(b), Example 9 (1972) (explaining an interest free loan from a not-for-profit to a low-income small business is a program-related investment and therefore qualifies as a charitable act).

These core First Amendment principles apply here. The Foundation was born out of concern about poverty rates in the Black community in Knoxville and maintains a goal of aiding

[5] I.R.S. Program-related investments, https://www.irs.gov/charities-non-profits/private-foundations/program-related-investments (last updated Oct. 9, 2025).

this economically disadvantaged community. *See* SUF ¶¶ 1, 2, 7. The program furthers this speech and association by investing in the community disproportionally affected by poverty. Because the loan application process is the vehicle through which the Foundation selects the recipients of its charity and support, that process is "part and parcel" of the expressive conduct and "merit[s] First Amendment protection." *Claybrooks v. Am. Broad. Cos.*, 898 F. Supp. 2d 986, 993 (M.D. Tenn. 2012).

*Claybrooks* is instructive. There, minority applicants to the television franchise *The Bachelor* sued ABC, alleging that it denied them equal opportunity to contract to be on the show in violation of § 1981. 898 F. Supp. 2d at 990. ABC argued that § 1981 could not be applied to "force [ABC] to employ race-neutral criteria in the casting process, thereby regulating the creative content of the show[s]" in violation of the First Amendment. *Id*. at 993. The court agreed, finding that "casting and the resulting work of entertainment are inseparable and must both be protected to ensure that the producers' freedom of speech is not abridged." *Id*. at 999. The court dismissed the case, since § 1981 could not be used "to alter the [show's] messaging." *Id*. The "First Amendment prevents [Plaintiff] from … forcing the Defendants" to alter their charitable work. *Id*. at 1000. In fact, as the Supreme Court has made clear, anti-discrimination statutes cannot be used "to compel an individual to create speech she does not believe." *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 579 (2023); *see also Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995).

In short, the Foundation has a First Amendment right to distribute its funds as it sees fit and Plaintiff is prohibited from altering the Foundation's messaging. Any other result would run counter to the practices of charitable giving and the core First Amendment protections afforded to such activity.

#### 2. Even assuming Plaintiff's claim could survive, Defendant's program is a valid affirmative action program.

Even if Plaintiff could overcome the fundamental jurisdictional hurdles and claim deficiencies (which it cannot), Plaintiff's § 1981 claim would *still* fail because the Foundation acted pursuant to a valid affirmative action plan. *See, e.g.*, *Johnson v. Transp. Agency*, 480 U.S. 616, 626-27 (1987); *see also Rabbani v. General Motors Corp.,* No. 3:98cv425/RV, 2000 WL 36752977, at *1 (N.D. Fla. July 26, 2000) (rejecting a § 1981 challenge to GM's "Minority Dealer Development Program" because it was a valid affirmative action program). Like the program upheld in *Rabbani*, the Foundation's program seeks to address the "manifest racial imbalance" in access to capital for Black-owned businesses in Knoxville. *See* SUF, ¶¶ 4–7. The interest free loan program thus rests on a valid factual predicate of a manifest racial imbalance. *See* SUF, ¶¶ 4–7. Further, the program avoids "unnecessarily trammeling" the rights of Plaintiff's anonymous members, as denial of the Foundation's modest grant of $200 to $2,000—to which Plaintiff's members have no "legitimate, firmly rooted expectation" or "absolute entitlement" to—does not limit Plaintiff's members' access to funding in any meaningful way. *Johnson*, 480 U.S. at 638.

### IV. The Women, LLC is entitled to summary judgment on all claims because it has no involvement in the Foundation's program

The Foundation and the Women, LLC are separate entities. *See* SUF, ¶ 15. The loan program at issue has been offered and operated by the Foundation, not the LLC. *See* SUF, ¶ 15. The Women, LLC has not and will not issue microloans or any other form of credit, and the LLC has not been and will not be a party to any contract at issue in this case. *See* SUF, ¶ 15. This means that the LLC is not a "creditor" under ECOA, nor has it ever contracted with program participants. Accordingly, regardless of how the Court resolves the arguments above, the LLC is entitled to summary judgment on all of Plaintiff's claims.

## CONCLUSION

The Court should grant Defendants summary judgment on Counts I and II of Plaintiff's Complaint [Doc. 1].

Respectfully submitted.

October 28, 2025

/s/ Scott D. McCoy
Scott D. McCoy*
Southern Poverty Law Center
2 South Biscayne Boulevard, Suite 3750
Miami, Florida 33131
(334) 224-4309
(786) 237-2949 (fax)
scott.mccoy@splcenter.org

Alphonso David*
Global Black Economic Forum
34 35th Street, Suite 5A
Brooklyn, New York 11232
(212) 287-5864
alphonso.david@gbef.com

Chris Irwin
BPR 025478
2131 Riverside Drive
Knoxville, Tennessee 37915
(865) 257-4029
christopherscottirwin@yahoo.com

*Counsel for Defendants The Women, LLC and The Women Foundation*

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Scott McCoy, hereby certify that the foregoing document filed through the ECF system was on counsel of record for Plaintiff via CM/ECF on October 28, 2025. Pursuant to Federal Rule of Civil Procedure 5(b)(2)(E), the Notice of Electronic Filing generated by CM/ECF shall constitute service of the electronically filed document on counsel of record.

Dated: October 28, 2025

*/s/ Scott D. McCoy*
Scott D. McCoy